J-S50012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JEREMY OGROSKY | : | |
| | : | |
| Appellant | : | No. 1705 WDA 2017 |

Appeal from the Judgment of Sentence July 6, 2017
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0003943-2015

BEFORE:  BOWES, J., OTT, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:　　　　　　　　**FILED OCTOBER 16, 2018**

Jeremy Ogrosky appeals from the judgment of sentence of ten to twenty years after a jury found him guilty of robbery, conspiracy to commit robbery, and theft by unlawful taking.  We affirm.

The trial court offered the following summary of the evidence offered at Appellant's trial.

> Alicia Aiello testified that she was working as a teller at First Commonwealth Bank on June 17, 2014.  She stated that during her shift at approximately 2 p.m., she noticed a male enter the bank who "was dressed like it was winter" despite the warm temperature that day.  He was wearing a turtleneck sweater, coat, hat, and sunglasses.  This struck Aiello as odd, and she testified that "my first thought was he was a robber."  At that point, he approached her teller station and had money in hand as if he was prepared to make a deposit.  He then began to "fumble" around in a messenger bag, pull out a folder, and place it on the counter. He then opened the folder and "was stuttering a little bit."  At that point, Aiello noticed that the man was pointing a gun at her.  He demanded that Aiello give him all of the money at her station. She obliged, and gave him all of the money in her drawer.  Aiello described the gun as black in color and "very similar in the shape

and size of a Glock." She also testified that the man appeared to be under the influence of drugs. Aiello stated that his skin color also struck her as odd. She testified:

> . . . my first thought it was very unusual because of the color of his skin. He just didn't look normal. It looks like he was . . . African American but he didn't have the features. He just was very odd to me. It stuck out to me. He had facial hair on his face but it just didn't look normal to me, like, either it looked like it was almost painted on or to cover up. If he is robbing a bank he doesn't want people to see his features. I get that. That's what it appeared to me, that it was put there and it was not normal.

She also testified that the man had "the beginning markings" of a tattoo on his left hand. Aiello stated that she handed the man approximately 700 dollars. She estimated his height as "average, maybe a little taller." She stated that she was frightened during the robbery, and she felt that she would be hurt if she did not comply with his demands.

> . . . .

Alesha McGough testified that on June 17, 2014, she was employed as a drug and alcohol treatment counselor at Mon-Yough Community Services. On that date, [Appellant] was scheduled for an appointment with McGough at 2:30 p.m. McGough testified that[Appellant] did not arrive until 2:45 p.m. When he arrived, he was wearing a "wife -beater" shirt and brown cargo pants and was wearing flip flops. She testified that when he arrived, he informed the front desk staff that he wanted to meet with McGough. McGough met him in the front lobby.

[Appellant] informed her that he could not stay to formally meet with her because his girlfriend was waiting for him outside and he had to leave because he had been working all day. She stated that he appeared to be "rather agitated, kind of hyper . . . he wouldn't sit down in the lobby, he was kind of pacing around." She testified that while he was "usually kind of hyper," his behavior that day was "more over the top." She then walked him to the front door, and observed him entering the passenger side of a silver-gray four-door sedan. McGough estimated that in total, [Appellant] was at the facility for less than [five] minutes. She

stated that she did not observe any discoloration to his skin on that day, and that he "looked like he was clean."

Amanda Crusan testified that she had a romantic relationship with [Appellant] for approximately [one] year, which began in May 2013. In January 2014, Crusan and [Appellant] moved into an apartment together in Clairton, Allegheny County. During their relationship, Crusan was a heroin user, and would use [five to ten] stamp bags of heroin per day. Crusan testified that as of the time of trial, she was no longer was using heroin. She also testified that while the pair were living together, both of them were unemployed and were struggling financially. Crusan testified that [Appellant] was also a heroin user, and that they both purchased heroin from a man named Malcolm.

In June 2014, Crusan stated they owed a drug debt to Malcolm, and their utilities had been shut off as they had not been paid. To solve their financial issues, [Appellant] suggested to Crusan that they should rob a bank. At first, Crusan did not take his suggestion seriously, until he suggested it again a few weeks later. [Appellant] told Crusan that he would have to alter his appearance using makeup so that there would be a possibility that "he could get away with it." Although the two did not discuss what bank they were to rob, they traveled to Walgreen's in Lower Burrell approximately one week prior to the robbery. [Appellant] stole concealer, makeup applicators, and mascara.

At that point, their plan to rob a bank began to fully form. [Appellant] stated that they should use a rental car, and after the robbery, he would lay in the trunk so that he could remove the makeup, shave his beard, and change his clothes. Crusan purchased a gallon of water, razors, and makeup remover at Wal-Mart approximately [two] days before the robbery. Around that time, [Appellant] decided that he would rob First Commonwealth Bank in Salem Township. [Appellant] and Crusan slept at [Appellant's] father's home on the nights leading up to the robbery. They returned to their apartment on the morning of June 17, 2014 to prepare for the robbery. Crusan testified:

> . . . we started getting prepared for him to rob a bank. We put on the concealer, covered up his neck and his face and then used mascara to change the color of his hair. He . . . wore a black windbreaker suit, pants with matching coat and white shirt underneath it, and

- 3 -

he had wrapped, I don't know if it was a white shirt or tank top, around his neck to conceal the tattoos on his neck.

Crusan stated that she applied mascara to his hair and beard, and ensured that all of his exposed skin was covered with makeup. [Appellant] also was wearing sunglasses before he left the residence. Crusan stated that she was already in possession of a rental car, a silver Kia, as she had crashed her car approximately two weeks prior to that date. [Appellant] was also in possession of a black BB gun when he left the residence, although she did not believe that he would use it during the commission of the robbery.

When Crusan and [Appellant] arrived at the bank, Crusan testified that she parked in a parking lot of a McDonald's adjacent to the bank. At that point, Crusan made a phone call to 9-1-1 using a cell phone that was no longer in service. She stated that "I had called and I said that my name was Sara and . . . my neighbor was threatening to shoot my dog and that I needed police assistance." When the 9-1-1 operated asked Crusan for her phone number, she hung up and removed the battery from the phone. At some point during the phone call, [Appellant] exited the vehicle and walked in the direction of the bank.

When [Appellant] returned to Crusan's vehicle, he entered the trunk. He remained in the trunk for approximately 20-25 minutes. When [Appellant] climbed back into the front seat from the trunk, Crusan stated that she was on SR 30 in North Versailles, Allegheny County. Crusan stated that [Appellant] had changed his clothes and was wearing plaid shorts and a white tank top. He had shaved his head and face, and removed the makeup. He was also wearing flip-flops. [Appellant] counted the money he had recovered at the bank, and relayed to Crusan that he had recovered approximately 700 dollars.

Crusan stated that they eventually arrived at the drug and alcohol counseling center for [Appellant's] appointment. [Appellant] entered the facility and returned approximately [five] minutes later. Crusan then drove [Appellant] to his mother's house in Elizabeth, Allegheny County. Crusan testified that she believed that [Appellant] disposed of the clothing he used in the commission of the robbery at his mother's house. [Appellant] also met with Malcolm, who sold him heroin, and paid him the debt

- 4 -

which was owed to him. Crusan stated that [Appellant] gave all of the money he received during the robbery to Malcolm.

A few days after the robbery, Crusan spoke to Trooper Gross during a traffic stop. Trooper Gross showed her photographs taken from surveillance footage during the robbery. When Trooper Gross asked her whether she knew who had robbed the bank, Crusan replied that it was probably a hitchhiker that she had picked up earlier in the day on June 17, 2014. She informed Trooper Gross that she (sic) had picked up the hitchhiker at Sheetz on Mosside Boulevard in Monroeville. She stated that after she picked up the hitchhiker, she drove toward Vandergrift to visit her children. She told the trooper that the hitchhiker "looked like a Muslim." She also stated that she dropped the hitchhiker off at the McDonald's in Delmont. She told the trooper that [Appellant] had been at his mother's house at the time of the robbery because he had a drug and alcohol appointment later that day. She told Trooper Gross that she never made it to Vandergrift, and turned around to pick up [Appellant] for his appointment. She testified at trial that she told Trooper Gross that the hitchhiker was Muslim for the following reason:

> . . . we had discussed what had happened at the bank [and] [Appellant] told me that he used . . . an accent that would have - that somebody was Muslim would have sounded like, like, somebody from - I don't [know], like, Iraq or Afghanistan, like, that area. He said he sounded like that. That's why I said he was Muslim.

Crusan said that when she talked to Trooper Gross, nothing in her story was the truth.

After "a substantial period of time," Crusan went back to the police, though neither she nor [Appellant] had been charged with the bank robbery. Crusan stated: "At that point I was clean and my mind was clear. I had a lot of time to think about it, about my family, about my kids, and it was the right thing to do." She traveled to the Vandergrift Police Department and spoke with Corporal Fennell of the Pennsylvania State Police and informed him of what transpired.

. . . .

Brian Gross, retired Trooper for the Pennsylvania State Police, testified that the first time he spoke with Amanda Crusan [she] had informed him that she picked up a Muslim hitchhiker the day of the bank robbery. When Gross asked her [to] repeat her story, she again told him about the Muslim hitchhiker.

Gross stated that he conducted searches of [Appellant] and Crusan's vehicles and the pair's residence on June 21, 2014. From Crusan's vehicle he recovered aviator sunglasses and a backpack. He also located a disposable razor in the driver side door, and on the floor. At the residence, Gross recovered dark-colored makeup and a black messenger bag.

The parties agreed to the following stipulation:

On the afternoon of June 19, 2014, Patrolman Nathan Rigatti of the Vandergrift Police Department conducted a traffic stop of a silver Kia Forte. The vehicle had been rented by Amanda Crusan and was being operated by [Appellant] with Amanda Crusan in the passenger seat. The Vandergrift Police notified the Pennsylvania Board of Probation and Parole of the traffic stop, and then later notified the Pennsylvania State Police at Kiski.

Joyce Douglass, state parole agent, testified that in June 2014, she was supervising [Appellant]. As a result of the traffic stop involving [Appellant] on June 19, 2014, Douglass conducted a parole search at [Appellant's] residence on the same date. Upon arrival, she recovered a $CO_2$ pistol from [Appellant]'s living room. Douglass explained the pistol resembled a Glock pistol. Douglass later learned that the $CO_2$ pistol had been destroyed so that it was unavailable at trial.

Trial Court Opinion, 10/25/17, at 2-9 (footnote and citations omitted).

Upon this evidence, the jury convicted Appellant of robbery, conspiracy to commit robbery, and theft by unlawful taking. As Appellant had a prior conviction for a violent crime, the Commonwealth gave notice of its intent to

seek a mandatory minimum sentence of ten years pursuant to 42 Pa.C.S. § 9714(a).[1]

Appellant was sentenced to ten to twenty years imprisonment on July 6, 2017. He filed a timely post-sentence motion which was denied by opinion and order of October 25, 2017. Appellant filed a timely notice of appeal, and both Appellant and the trial court complied with Pa.R.A.P. 1925.[2] On appeal, he asks this Court to review whether the evidence was sufficient to sustain his convictions, and whether the verdict was against the weight of the evidence. Appellant's brief at 4.

We first consider our standard of review applicable to Appellant's sufficiency challenge.

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving

---

[1] The statute providing mandatory minimum sentences based upon the fact of prior convictions is not unconstitutional under **Alleyne v. United States**, 570 U.S. 99 (2013). **See Commonwealth v. Reid**, 117 A.3d 777, 785 (Pa.Super. 2015) (holding 42 Pa.C.S. § 9714(a) is not unconstitutional under **Alleyne**).

[2] The trial court' statement pursuant to Pa.R.A.P. 1925(a) indicated that the reasons for its decision were offered in its October 25, 2017 opinion accompanying the denial of Appellant's post-sentence motion.

every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Williams*, 176 A.3d 298, 305-06 (Pa.Super. 2017) (citations and quotation marks omitted).

The only element of the offenses that Appellant challenges on appeal is that of identity. Specifically, Appellant contends that the perpetrator of the robbery was "either a light-skinned African American or Semitic male," while Appellant is Caucasian. Appellant's brief at 9. He also notes that he is one or two inches shorter than the bank teller described, and challenges the ability of someone to clean off all of the makeup and shave his face and beard in the trunk of a small vehicle. *Id*. Appellant further questions the credibility of Crusan, given that she initially identified someone who did not meet Appellant's description, and had the motive to implicate Appellant in order seek favorable treatment for her cooperation with the prosecution. *Id*.

Crusan testified under oath at trial that Appellant was her co-conspirator who committed the robbery. That alone is sufficient evidence to establish the identity element of the crimes, even without the substantial corroborating evidence, detailed above. *Commonwealth v. Johnson*, 180 A.3d 474, 478 (Pa.Super. 2018) ("A [witness's] in-court testimony, identifying the defendant as the perpetrator of a crime, is by itself sufficient to establish the identity element of that crime"); *Commonwealth v. Wilder*, 393 A.2d 927, 928

- 8 -

(Pa.Super. 1978) ("[I]t is settled that a positive identification by one witness is sufficient for conviction.").

Appellant's arguments more properly go to the weight, not the sufficiency, of the evidence. Indeed, he invokes the same arguments in his brief to this Court. *See* Appellant's brief at 10. The following principles apply to our review of that challenge.

> Appellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013).

The trial court, having reviewed all of the evidence in connection with its disposition of Appellant's sufficiency challenge, offered the following analysis of Appellant's claim that the evidence was against the weight of the evidence.

> At trial, the jury determined that Amanda Crusan was a credible witness, and chose to believe her testimony regarding [Appellant's] role in the robbery.
>
> It is not the [trial court's] role to disturb the jury's credibility determinations. Based on the [c]ourt's own independent review of the record, the guilty verdict did not shock the [c]ourt's sense of justice, nor was it the result of pure conjecture.

Trial Court Opinion, 10/25/17, at 15.

Our review of the record reveals no inconsistencies in the evidence or need for speculation on the part of the jury. These Commonwealth witnesses, if believed, established Appellant's identity as the bank robber. Accordingly, our review of the record reveals no abuse of discretion on the part of the trial court in holding that the verdict did not shock its conscience, and Appellant is entitled to no relief from this Court on his weight-of-the-evidence claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/16/2018